FILED
February 19, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: ____Aida Baeza____
DEPUTY

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF TEXAS

# PECOS DIVISION

| | |
|---|---|
| GEORGE IROGBELE,<br><br>    Plaintiff (Pro Se),<br><br>v.<br><br>COIL TUBING PARTNERS, LLC<br><br>    Defendant. | Case No ___P25-cv-00009___<br><br><br>JURY TRIAL DEMANDED |

## ORIGINAL COMPLAINT

The Plaintiff George Irogbele (hereinafter "George" or "plaintiff") brings this action against the defendant Coil Tubing Partners LLC (hereinafter "CTP") to recover lost wages—both past and future—and to seek adequate compensation for the loss of health insurance benefits. CTP retaliated against the plaintiff by wrongfully terminating his employment on October 17, 2024, for engaging in a protected activity on October 15, 2024, in violation of Title VII and Section 704(a) of Title VII of the Civil Rights Act of 1964 ("Title VII").

Plaintiff also contends that CTP violated the Family and Medical Leave Act (FMLA). Specifically, during a call on October 15, 2024, at 1:21 AM, when Chad Fox, a coordinator with CTP, stated—

paraphrased— "This has been going on for too long; you will have to come in to talk to Emile (Operations Manager) after the 8 AM safety meeting." Plaintiff interprets this as a reference to a medical emergency involving his pregnant wife on September 5, 2024, and a personal medical emergency he experienced on October 14, 2024, while heading to work. The plaintiff argues that these events contributed to the pre-textual reasons for his termination.

## I.

## OVERVIEW

The plaintiff, George Irogbele, is a Black American immigrant of Nigerian descent. He began working for the defendant, CTP, on August 8, 2022, and performed his duties diligently with no incidence of known misconduct, tardiness, write-ups, or performance issues. Until 5 PM on October 17, 2024, plaintiff was treated with dignity and respect by CTP, experiencing no discrimination or disparate treatment.

(a) **Employment details**: At hire, the plaintiff was an equipment operator with five years of oil field experience and a strong desire to join CTP. The hiring agency was aware of two competing offers: one from Schlumberger and another from American Cement. Ultimately, the plaintiff chose CTP as the best fit.

The plaintiff worked a rotational schedule of two weeks on duty followed by one week off, assigned to Unit 25, which included 15 employees divided into three groups of five. After a performance review on July 3, 2023, the plaintiff received a 10% raise effective September 1, 2023.

Plaintiff's assigned Unit 25 primarily served one oil producer, working 80% of their time for this client during 2022, 2023, and 2024. The remaining 20% was distributed among 11 other oil

producers. One of these other companies, Oxy Petroleum, was involved in the incident on October 15, 2024, during which the protected activity occurred.

(b) **Background** Oxy Petroleum (hereinafter "Oxy") is the principal client of CTP involved in the protected activity. Gate guard (hereinafter "Jane Doe") is the female eyewitness who observed the plaintiff's opposition to a demand that was reasonably believed to be illegal. Rodolfo Chavez (hereinafter "Rudy") is a CTP employee who drove the Ford F-250 in which the plaintiff was a passenger on the day of the incident. Jane Doe is employed by John Doe, her boss. Oxy owns oil wells serviced by CTP, and the wells in question on October 15, 2024, were located on private or lease roads owned by John Doe.

## II.

### DISCRIMINATION AND RETALLIATION CLAIMS

(a) **Discrimination:** To establish a prima facie case of discrimination based on race, sex, national origin, and age, a complainant must demonstrate: (a) that they are a member of a protected class; (b) that they suffered an "adverse employment action"; and (c) that there is a nexus between the disparate treatment and their membership in a protected class. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). To substantiate a claim of disparate treatment on discrimination grounds, a complainant must show that their employer has "treated [a] particular person less favorably than others because of" a protected trait. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 985–986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

(b) **Retaliation:** For retaliation claims brought under Title VII, a prima facie case consists of four elements: (1) the Charging Party's participation in protected activity; (2) the employer's awareness of the protected activity; (3) a subsequent materially adverse action against the employee; and (4) a causal connection between the adverse action and the protected activity. See Burlington Northern & Santa Fe Ry. v. White, 126 S. Ct. 2405 (2006).

(c) **FMLA Violation:** For FMLA violations, an employee must demonstrate that they engaged in (1) a protected activity such as requesting or taking FMLA leave, (2) suffered a negative employment action, and (3), a causal connection between the protected activity and the adverse employment effect.

(d) **Protected activity:** The Supreme Court has defined retaliation as an intentional act that occurs in response to a protected action. See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173–174 (2005). The Court further describes retaliation in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), as an adverse action taken by an employer against an employee as a result of engaging in a protected activity. The Court has generally interpreted anti-retaliation provisions broadly under Title VII to ensure that employees feel safe asserting their rights without fear of retribution.

The Equal Employment Opportunity Commission (EEOC) describes a protected action or activity under Title VII as any activity covered by the participatory or opposition clause, where an employee participates in an EEO process—such as being a witness to a discrimination or retaliation claim—or opposes, in good faith and in a reasonable

manner, any action deemed discriminatory, illegal, or unlawful under Title VII. The EEOC further emphasizes that the manner of objection must be reasonable, even if the challenged actions are ultimately lawful. The party objecting must demonstrate that, at the time of the objection, there was a reasonable belief that the actions in question were unlawful.

## III.

## JURISDICTION & VENUE

1. The jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e et seq. This suit is authorized under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. The court's jurisdiction is invoked to address the deprivation of rights secured by 42 U.S.C. § 2000e et seq.

2. This court also has personal jurisdiction because the protected activity occurred in Mentone, Texas, in Loving County, which falls within the court's district and division. Additionally, CTP conducts business and maintains an office where the plaintiff was hired within this district, albeit in a different division.

3. Venue is therefore proper in this court pursuant to 28 U.S.C. § 1391(b)

## IV.

## THE PARTIES

4. Plaintiff George Vaughan Irogbele is a Nigerian immigrant, a male citizen of the United States, and a resident of Maurice, Louisiana.

5. Defendant Coil Tubing Partners, L.L.C. is a limited liability company doing business in the State of Texas and headquartered in Louisiana. CTP employs more than 15 employees, thereby meeting the jurisdictional prerequisites of Title VII of the Civil Rights Act of 1964.

## V.

## ADMINISTRATIVE PROCEDURES

6. Plaintiff hereby adopts and re-alleges paragraphs (1) through (5) above as if fully set forth herein.

7. On October 22, 2024, within 180 days of the retaliatory and discriminatory act by the Defendant, which occurred on October 17, 2024, the Plaintiff filed an inquiry with the Equal Employment Opportunity Commission (hereinafter "EEOC"). Plaintiff subsequently had an initial interview with the EEOC and received his right to sue letter on January 24, 2025.

8. All administrative prerequisites for filing suit have been satisfied, and the Plaintiff is entitled to bring this action.

## VI.

## FACTUAL ALLEGATIONS

9. On October 14, 2024, while Plaintiff was heading to work, he experienced persistent chest pain that prompted him to go to the emergency hospital.

10. Plaintiff communicated this emergency to his supervisor, who instructed him to call the office. Plaintiff called at 1.21 AM on 10/15/2024 and was told by Chad Fox to speak with a manager Emile after the 8 AM safety meeting to explain the excuses because these issues had been occurring too frequently of late.

11. On October 15, 2024, after plaintiff talked to Emile, Plaintiff and CTP employee Rudy delivered supplies to a CTP crew working for Oxy. On their return, Jane Doe stopped their pickup truck and demanded that the driver (Rudy) produce his driver's license, along with a $150 fine for running a stop sign.

12. Rudy pleaded with the Jane Doe, who had a notepad and a red pen, stating she needed to write down his driver's license details and the fine.

13. Despite Rudy's persistent pleas, Jane Doe reiterated her demand for the driver's license and the fine. Rudy's pleas seemed to embolden Jane Doe.

14. At this point, Plaintiff interjected, advising Rudy to voluntarily provide his driver's license and the fine only if he chooses to. He cautioned that Jane Doe, being a private individual, lacked enforcement authority over traffic infractions on private roads.

15. Jane Doe responded that the entire incident was captured on surveillance camera and that her boss, John Doe, was watching. She stated she would call him if necessary.

16. Plaintiff replied, "Call your boss, call CTP, or better still, call the police. Only the police have the authority to enforce fines." Jane Doe insisted that this was a private road and that the owner had established fines for traffic violations, which she intended to enforce. The plaintiff didn't disagree with the ability of a land owner to fine traffic violators but hammered on the lack of authority private individuals have to enforce those fines.

17. Jane Doe walked away to call her boss, instructing the driver to park the truck next to her shack, which he did. Rudy then entered the shack to speak with John Doe on the phone.

18. Rudy and Jane Doe returned to the pickup truck. Jane Doe then told Plaintiff, "Just so you know, George, you are banned from this private road, and the ban will be enforced by me and any other person on duty."

19. From his passenger seat, Plaintiff leaned down and remarked, "If this ban makes you happy, so be it." Jane Doe responded as if she hadn't heard him, prompting Plaintiff to repeat, "If banning me makes you happy, so be it."

20. Jane Doe responds, "No, but try doing this job," referring to her work, and expresses that people like the driver and the plaintiff do not take her seriously.

21. Upon hearing this, the plaintiff touched his hand to his chest, stretched his hands toward her, and said, "I am sorry." He repeated this apology at least four times because it seemed there was an issue with her hearing it initially. The plaintiff apologized in response to her statement

that people do not take her job seriously, which was not the intention behind plaintiff's opposition to Jane Doe's demand.

22. Jane Doe tells the plaintiff, "I appreciate your apology, but you are banned from this lease road." The plaintiff responds, "Thank you." Jane Doe then walks back to her shack, and Rudy backs the truck to start heading out.

23. "The first comment the driver made to the plaintiff was that he, Rudy, had just spoken to John Doe, the boss, whom he knows personally because they have worked together previously."

24. Rudy and the plaintiff discuss the incident during the drive. Rudy receives calls from fellow employees asking about what happened on the private road because the office has been contacted, and Oxy seems very angry. One of those employees was a supervisor called Jeremy

25. Upon returning to the office, the plaintiff is told by a coordinator named Jose over the phone to hang around because management wants to talk.

26. Safety manager Guate Garcia enters the conference room with the plaintiff for a meeting. James Osborne, Dustin, Guate Garcia, and Keith Taylor are all present. All of them spoke to Rudy first, even though the plaintiff arrived at the office at least 30 minutes before Rudy arrived.

27. James Osborne sighs and says, "What happened? Oxy is making a big deal out of this, and they have called Houston." The plaintiff interprets this to mean that corporate headquarters of Oxy, located in Houston, Texas, is involved.

28. At this point, James Osborne asks the plaintiff, "George, was Rudy speeding on the private road?" The plaintiff responds, "No," and proceeds to explain what transpired on the private road.

29. The plaintiff also mentions during the meeting that he, George, was banned from the private road. Upon hearing this, James Osborne instructs Guate Garcia to ensure that this information—specifically that George was the one banned—is included in Rudy's witness statement.

30. After finishing his narration, the plaintiff shows Guate Garcia an internet search on his phone regarding how private citizens lack enforcement authority. He then handwrites his witness statement and types it on Guate Garcia's laptop. This statement is copied and handed to Guate Garcia, who assists Rudy in typing his own statement, which is half a page long.

31. On October 16, 2024, during the safety meeting, Guate Garcia speaks after James Osborne, who generically advises, "Guys, when you are on customers' properties, comply with everything they say or ask. If they ask for your driver's license, please give it to them and don't argue." James Osborne also mentions an unnamed employee who had a wreck with a pickup truck and failed to report it, stressing that the employee will face serious consequences for not reporting it.

32. After the safety meeting, the plaintiff speaks with Keith Taylor, asking what they intend to do. Keith responds that he was just asked to be a witness during the first meeting. The plaintiff then asks James Osborne the same question. Osborne replies that Dustin will be sent out to talk to Oxy with the statements from Rudy and the plaintiff. He tells the plaintiff to hang around in the yard and keep himself busy.

33. On October 17, 2024, around 5 PM, the plaintiff is called into Freddy's office. Freddy is seated behind his computer desk, James Osborne is standing, the plaintiff is sitting directly opposite Freddy's desk, and Dustin is sitting next to the plaintiff.

34. James Osborne states, "George, we will go ahead and terminate your employment. Oxy Petroleum has banned you from their leases and well sites going forward, which limits our use for you."

35. The plaintiff then asks one question: "Did Oxy read my witness statement?" Osborne replies no, and Freddy seems to mumble something in response, but it is Dustin who explains why the statement was never read.

36. Dustin explains that when he arrived at Oxy for a meeting, a company representative advised him not to show the statement during the meeting. Upon hearing this, the plaintiff stands up, thanks them all, shakes James Osborne's hand, thanks him again, and walks away.

37. The plaintiff intends to prove to this court using the reasonable belief standard that at the time of the opposition, there was belief that the demand made by Jane Doe was illegal and this opposition by the Plaintiff was done in a reasonable manner in accordance with the EEOC opposition clause of Title VII of the Civil Rights Acts of 1964.

38. CTP, in good faith and without obligation, had the opportunity to inform the Texas Workforce Commission (TWC) of the exact reason for the Plaintiff's termination. During a recorded call on 10/22/2024 at 9:15 AM, a TWC representative asked the Plaintiff for this reason. The Plaintiff told him the reason James Osborne had provided on 10/17/2024. The TWC caller stressed that Caroline Suire from CTP's corporate headquarters had responded to TWC's inquiry by stating that the Plaintiff was fired by James Osborne, but Caroline did not provide a specific reason for the termination, hence the reason TWC called the Plaintiff.

39. TWC informed the Plaintiff that they would convey his explanation back to CTP. On 11/04/2024, the Plaintiff received a letter from TWC stating that their investigation concluded plaintiff was not fired for misconduct. Consequently, TWC authorized a weekly payment of $591 to the Plaintiff. This payment represents an approximate 83% to 85% reduction in his monthly wages prior to termination.

40. In response to a demand letter sent by the Plaintiff's former counsel on or about 12/21/2024, CTP, through outside counsel, replied on or about 01/02/2025, stating that the Plaintiff was fired for misconduct and that no negotiations would occur. This was the first time CTP mentioned "misconduct" to the Plaintiff in 26 months of employment. I request that this court allow CTP the opportunity to clarify what specifically constituted misconduct.

## VII.

## STATEMENT OF PLAINTIFF'S CLAIMS

## COUNT ONE

### (Action Alleging Title VII violation based on Discrimination)

41. CTP, having been fully aware of the protected activity by the plaintiff in opposing a demand he felt was illegal, and doing so in a manner that the plaintiff contends was reasonable and in good faith, fired the only immigrant who, to the plaintiff's recollection, had been in such a situation. This action was in clear violation of Title VII of the Civil Rights Act of 1964, as amended.

42. CTP engaged in selective and preferential treatment, as the plaintiff is fully aware that firing employees who are banned from performing services by Customer Company is not standard practice at CTP. CTP failed to terminate the employment of about four known current employees who had been banned by different customers in the past. Notably, all of them happen to be natural-born American citizens. I implore this court to provide CTP the opportunity to explain why the only immigrant was fired when others were banned due to activities such as insubordination and job performance issues.

43. The plaintiff also contends that disparate treatment in this case is sufficient grounds for a discrimination charge, regardless of the good relationship the plaintiff enjoyed with CTP before the protected activity. CTP, having never mentioned the word "misconduct" to the plaintiff in the 28 months since the day of hire, first addressed it in response to a demand letter dated January 2, 2025. The plaintiff contends that he is willing to assume, but not concede, this meritless reason for the sake of bolstering a disparate treatment claim. The plaintiff will

demonstrate to the court, using comparative evidence, that CTP applied inconsistencies in policy violation enforcement, and that national origin was the driving factor in this selective enforcement.

## COUNT TWO

### (Section 704[a] of Title VII violation based on Retaliation)

44. In *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), the Supreme Court addressed the "but-for" causation standard in the context of retaliation. The Court clarified that the employee must demonstrate that the adverse effect would not have occurred but for the employee's protected activity.

45. The plaintiff will use this standard to demonstrate to the court that CTP took adverse action primarily because of the protected activity, and will also show the causal connection between the protected activity and the adverse action. Whatever pre-textual reason or reasons CTP presents will be debunked strictly using these standards, as the evidence will show. The first verbal reason given on 10/17/2024 will be debunked with dates, graphs, charts, and work history that will clearly illustrate a pretext, especially when juxtaposed with the selective treatment of comparable employees. The second reason giving on 01/02/2025 will be debunked with the surveillance video in possession of John Doe if this court so orders and also with selective enforcement of disciplinary actions of comparable employees who have had numerous misconducts. Dates and names of these employee(s) are documented and will be provided when CTP categorically states what exactly constituted misconduct by the plaintiff in 26 months of his employment.

46. The plaintiff acknowledges that, according to the Supreme Court's ruling in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), CTP's motive or intent does not need to be proven. However, the retaliation he faced would deter a reasonable employee from raising concerns about potentially illegal activities related to CTP's customers in the future. The plaintiff also asserts that CTP used him as an example to discourage other employees from resisting any perceived illegal demands of their valuable customers.

## COUNT THREE

**FMLA Violation**

47. Chad Fox's comment on 10/15/2024 at 1:21 AM, stating, "these excuses have been going on for too long, and you will have to talk to Emile after the 8 AM safety meeting," can be seen as discriminatory. This is evident when considering that other employees with emergencies did not have to wait for the 8 AM meeting to speak with Emile. This comment led to the plaintiff being held back from joining his crew after arriving 1.5 hours late from the hospital. This is not standard CTP practice, because Chad Fox on the same day sent a natural born American employee who came late out to join his crew but told the plaintiff to wait until Emile came to work at 8am. Chad Fox's comment suggests a selective doubt regarding the legitimacy of the plaintiff's emergency, reflecting a bias by CTP. This in itself is strange when you consider the plaintiff had never been late in 26 months of employment.

48. The plaintiff is aware of another employee who came back from a personal medical emergency on 09/09/2024 who did not have to wait until 8am to talk to Emile. The employee never had to explain his situations to Emile. The plaintiff will provide dates and times to demonstrate that this employee could not have spoken to Emile in person to provide proof of his emergency like the plaintiff was required to do. The plaintiff was present when the employee returned from his emergency at around 6am on 09/09/2024 and even drove him to the job site before the commencement of the safety meeting. Notably, the employee is natural-born American citizens.

49. "Barring any adverse employment effects, the plaintiff acknowledges that the comment made by Chad Fox, while insensitive, does not provide a solid basis for a federal court claim under FMLA violations. Employers have the right to express insensitivity or skepticism regarding employees' needs. However, when considering the protected activity of the plaintiff and the temporal proximity between the comment and the adverse employment action, such a comment warrants scrutiny. It could be perceived as a motivating factor for the termination of the plaintiff and should be examined under the preponderance of evidence standard." The plaintiff intends to show this court that going in to talk to managers after an emergency is not standard practice at CTP or if it is, it was applied discriminately and this will be proven

## VIII

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief based on the cumulative claims set forth in Counts One, Two, and Three:

1. **Compensatory Damages**: Plaintiff respectfully requests that the Court award compensatory damages for past and future lost wages, including any benefits, incurred as a result of the unlawful actions of CTP. This includes the substantial financial hardship resulting from the termination of employment following the plaintiff's protected activity, which has severely impacted his ability to support his family, including his pregnant wife.

2. **Health Insurance Loss**: Plaintiff seeks relief for the loss of health insurance coverage for his family, which has caused significant distress and anxiety, particularly due to the ongoing health and financial implications of the pregnancy. The loss of this crucial benefit has exacerbated the emotional strain caused by the wrongful termination.

3. **Punitive Damages**: Pursuant to Title VII of 1991 Civil Rights Acts as amended, Plaintiff respectfully requests that the Court consider awarding punitive damages against CTP if it is determined that their actions were particularly egregious or malicious, as a means to deter such behavior in the future and to uphold the principles of justice and equality in the workplace.

4. **Other Relief**: Plaintiff requests any additional relief that the Court deems just and proper, and any other remedies necessary to address the injustices faced by the plaintiff as a result of CTP's unlawful retaliatory conduct.

Respectfully Submitted,

By: George V. Irogbele (Pro Se)

147 Melanie Rose, Maurice LA 70555

832-907-1863

Date 02/14/2025

Signature: _____

PLEASE SERVE:

Coil Tubing Partners, LLC

Through its registered agent for service:

Henry C. Perret, Jr.

721 Cambridge Dr

Lafayette, Louisiana 70503